before a court can consider whether "other rights or liabilities may be affected by the case's determination." In my opinion, when our review of a protection order appeal reveals errors or deficiencies in the record that warrant reversal and vacation of the protection order, having such an order vacated should qualify as a "right" belonging to the respondent that should invoke this other exception to the mootness doctrine. However, the other rights or liabilities exception has not been examined by the Nebraska Supreme Court in this specific context, and an analysis of this other exception is unnecessary to the resolution of the appeal before us currently, since the public interest exception can be invoked instead.

―――――――――

Troy Bird, appellee, v.
Brekk Bird, appellant.
___ N.W.2d ___

Filed September 2, 2014.    No. A-13-912.

1. **Child Custody: Appeal and Error.** Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

2. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

3. **Child Custody.** Ordinarily, custody of a minor child will not be modified unless there has been a material change of circumstances showing that the custodial parent is unfit or that the best interests of the child require such action.

4. **Modification of Decree: Child Custody: Proof.** The party seeking modification of child custody bears the burden of showing a material change of circumstances affecting the best interests of a child.

5. **Child Custody.** In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must also demonstrate that it is in the child's best interests to continue living with him or her in the new location.

6. **Child Custody: Intent.** When a parent sharing joint legal and physical custody seeks to modify custody and relocate, that parent must first prove a material change in circumstances affecting the best interests of a child by evidence of a legitimate reason to leave the state, together with an expressed intention to do so.

7. **Modification of Decree: Child Custody: Proof: Intent.** Proving an intent to leave the state does not necessitate that physical custody be modified, but the intent to move illustrates the likelihood that there is a need for considering some sort of modification that would reflect the new circumstances.

8. **Child Custody.** As a practical matter, the existence of a joint physical custody relationship is likely to make it more difficult for the relocating parent to meet the burden associated with relocation.

9. **Appeal and Error.** An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it.

10. **Modification of Decree: Child Custody.** Whether an appellate court is considering a modification of custody or a proposed removal from the state, the paramount consideration is the best interests of the children.

11. **Child Custody: Visitation.** In determining whether removal to another jurisdiction is in the child's best interests, the trial court evaluates three considerations: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent.

12. **Child Custody.** The ultimate question in evaluating the parties' motives for relocation is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party.

13. ____. In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the children and the parent seeking removal, a court should consider the following factors: (1) the emotional, physical, and developmental needs of the children; (2) the children's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the children and each parent; (7) the strength of the children's ties to the present community and extended family there; and (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties. This list should not be misconstrued as setting out a hierarchy of factors. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted.

14. **Child Custody: Visitation.** The impact that relocation will have on contact between the child and the noncustodial parent must be viewed in light of the court's ability to devise reasonable visitation arrangements.

15. ____: ____. Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent.

Appeal from the District Court for Lancaster County: Robert R. Otte, Judge. Affirmed.

Brandie M. Fowler and Matthew Stuart Higgins, of Higgins Law, for appellant.

Troy Bird, of Bird Law Firm, pro se.

Moore, Pirtle, and Riedmann, Judges.

Riedmann, Judge.

## I. INTRODUCTION

Brekk Bird appeals the decision of the district court for Lancaster County which denied her request to modify the parties' dissolution decree to award her sole legal and physical custody of their minor children, denied her request to remove the children from Nebraska to Utah, and granted Troy Bird's request to decide where the children would attend school. For the reasons set forth below, we affirm.

## II. BACKGROUND

Troy and Brekk were married in Salt Lake City, Utah, in 2003. They moved to Nebraska in 2009 and were divorced in September 2011. Two minor children were born of the marriage: a son, Cohen Bird, born in 2008, and a daughter, born in 2010. In its divorce decree, the district court for Lancaster County denied Brekk's request to remove the children from Nebraska to Utah and instead awarded the parties joint legal and physical custody, with each parent having physical custody of the children on alternating weeks. The court noted that Brekk's request to remove the children to Utah was "premature," because the parties had agreed to remain in Nebraska for the duration of Troy's law school education, of which he had 1 year remaining at that time.

In May 2012, Brekk filed a complaint for modification of the decree requesting sole legal and physical custody of the children and permission to remove the children to Utah. She alleged there had been a material change of circumstances since the entry of the decree because Troy had completed law school and she had been offered enhanced employment in St. George, Utah. Troy filed a countercomplaint seeking permanent legal custody of the minor children, as Cohen was scheduled to begin kindergarten in the fall and the parties could not agree on where he would attend school. Troy also sought primary legal and physical custody of the children, in the event that Brekk relocated to Utah.

Troy and Brekk moved to Lincoln, Nebraska, in 2009 so Troy could attend law school at the University of Nebraska. Prior to moving to Nebraska, they resided in Troy's hometown of Orem, Utah. Brekk testified that Troy wanted to attend a law school in Utah but was not able to gain admission. They made a joint decision to move to Nebraska, but planned to move back to Utah to be close to their families after Troy finished law school.

Both parties have extended family in Utah, albeit in different cities. Neither party has any relatives in Nebraska. Troy did not dispute that the parties had discussed moving back to Utah after law school; however, he testified that they had never agreed to move to St. George. Orem, where the parties resided before moving to Nebraska, is approximately 400 miles from St. George.

Brekk testified that she wanted to relocate with the children to St. George, because the majority of her family lived there, including her parents, with whom she had a very close relationship. In addition, Brekk had obtained an offer of employment to work as a substitute teacher at a crisis center and school for troubled youth in St. George. The center is a family-owned business, owned in part by Brekk's father.

According to the terms of the job offer, Brekk would work 30 to 35 hours per week at a rate of $25 per hour and receive health care, dental, and retirement benefits. She would also have the opportunity to obtain the necessary credentials to become a permanent teacher in Utah by working under the supervision of another teacher at the school. Brekk's mother would provide care for the children while Brekk was working, including transportation to and from school if necessary. In the event that Brekk's mother was not available, other relatives and close friends would be available to help care for the children.

Brekk believed that the offer of employment in St. George was far better than anything she could hope to obtain in Nebraska. After Troy and Brekk separated, Brekk moved from Lincoln to Gretna, Nebraska. She was currently employed as a substitute teacher at a school near Gretna, where she worked 10 hours every other week and earned approximately $400 per

month. However, she would not be able to continue teaching certain classes at that school the following year unless she became a certified teacher, which would require her to complete at least 1 to 2 years of additional schooling. Brekk testified that she had applied for various other positions in Omaha, Nebraska, and Lincoln, but was unable to find suitable employment that would allow her to stay home with her children every other week.

If permitted to move to St. George, Brekk and the children would live rent free in a home owned by her father that was currently for sale. Brekk would be responsible for paying the utilities, keeping the house clean, and showing the house to potential buyers. If and when that house sold, Brekk and the children could live in other homes owned by her father under the same arrangement. Brekk testified that the home had a fenced backyard in which the children could play and would be a significant improvement from her apartment in Nebraska. She believed it would improve the quality of life for herself and her children.

Brekk researched and submitted applications for three possible schools for Cohen to attend in St. George, including a charter school that emphasized technology and performing arts. Brekk testified that it was the top-rated charter school in St. George and that she believed it offered a much better education than public schools. Brekk wanted Cohen to attend school there, but stated that she would be willing to discuss all three schools with Troy.

Brekk offered a calendar from the charter school with all of the school holidays and surrounding weekends highlighted. She explained that those were all of the days that Cohen would be available to have visitation with Troy. According to this calendar, Cohen would have approximately 45 days during the school year that he could spend with Troy, not including travel time, plus 12 weeks during the summer. Brekk testified that she would be willing to split Troy's travel expenses and accommodate his visitations with the children in Utah.

Brekk believed her financial circumstances would be greatly improved if she were permitted to relocate to St. George. Currently, Brekk was reliant on financial support from her

father in the amount of $25,000 to $30,000 per year, as well as public assistance for food and medical care for herself and the children. Relocating to St. George would allow her to earn a substantially higher wage while having access to rent-free housing and free daycare for the children.

Troy admitted that he had not made any attempts to obtain employment in St. George or the surrounding areas. He testified that he did not want to live in St. George, because it is a "small town" in which Brekk's father is "well known," and that he believed his career opportunities would be limited there. Additionally, Troy was not eligible to practice law in Utah, and he testified that he intended to continue practicing law in Nebraska.

Troy opened his own law practice in Lincoln in November 2012. Although it was slow in the beginning, Troy testified that his business was growing and that he continued to add new clients on a regular basis. The evidence showed that from January through June 2013, his firm earned approximately $10,500. After deducting the firm's expenses, however, its net income was approximately $5,600 over those 6 months.

Troy admitted that he was not currently able to support himself and his children on his own, but he stated that he was getting closer each month. He relied on financial support of $1,200 to $1,800 per month from his parents and $200 per month in public food assistance. Nonetheless, he believed his firm was doing well for having been open for only 8 months, and he expected his monthly gross income to reach $4,000 to $5,000 by the end of the year.

Troy managed his work schedule in such a way as to maximize his time with his children. He worked only 10 to 15 hours during the weeks that he had the children, and he then worked extra hours during the weeks that the children were with Brekk. If he had to work or attend a hearing during his parenting time, he had friends and church members that were available to watch the children.

Troy testified that the alternating weekly custody arrangement was working well and that the children were accustomed to it. Ideally, he would like Brekk to move to Lincoln so that they could continue the shared custody arrangement and

avoid transporting Cohen back and forth between Lincoln and Gretna for school each day. Troy testified that there was no reason Brekk could not relocate to Lincoln. Brekk admitted that there was no employment that prevented her from leaving Gretna and that she could move to Lincoln.

Troy testified that he was requesting legal custody due to concerns about Brekk's ability to make decisions for the children, particularly regarding school. He explained that Cohen would be starting kindergarten the following month and that he and Brekk were unable to agree on a school for Cohen to attend. Troy believed it would be best for Cohen to attend school in Lincoln; however, he stated that if granted sole legal custody, he would be happy to consider Brekk's opinion on the matter. Brekk wanted Cohen to attend the charter school in Utah. She testified that she had visited a school near her apartment in Gretna, but she did not indicate whether she desired or was willing to send Cohen to school there.

Troy did not believe it would be in the children's best interests to move to Utah, because they have a very close bond with both parents and he believed it would be very difficult on them to go long periods of time without seeing one parent or the other. Brekk acknowledged that she and Troy were the two most important people in the children's lives and that the children's time with Troy would be diminished if they moved to Utah. She further stated that she did not think it was the ideal situation, but that it was "the best [they had] right now."

Both parents agreed that hostilities between them would not be significantly affected if Brekk were allowed to move to Utah with the children. Brekk believed that she and Troy would be able to "figure it out" whether she stayed in Nebraska or moved to Utah. She believed Troy loved their children and that no matter where they lived, Troy would make an effort to see them.

The district court entered an order of modification on September 19, 2013. It found that a material change in circumstances had occurred and that Brekk had demonstrated a legitimate reason for leaving Nebraska. However, it denied her request to remove the children to Utah, based on its finding

that removal would not be in the best interests of the children. The court further found that it was in Cohen's best interests to attend school in Lincoln, and it awarded Troy the authority to decide where the child would attend school in Lincoln. Brekk timely appeals.

## III. ASSIGNMENTS OF ERROR

Brekk assigns that the district court erred in (1) determining that removal of the minor children from the jurisdiction was not in their best interests; (2) determining that Troy's motives for opposing removal did not appear to be spiteful, vindictive, or improper; (3) finding that the emotional, physical, and developmental needs of the children would not be enhanced by a move to Utah; (4) determining that the quality of life for the minor children would not be substantially different in Utah; (5) failing to consider a reasonable visitation schedule for Troy which would afford Brekk the ability to relocate with the children; and (6) determining that Troy should be granted the authority to determine the school district of the minor children.

## IV. STANDARD OF REVIEW

[1] Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013).

[2] When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Keig v. Keig*, 20 Neb. App. 362, 826 N.W.2d 879 (2012).

## V. ANALYSIS

### 1. Modification of Custody and Removal From Jurisdiction

Brekk's first five assignments of error allege various reasons the district court erred in determining that removal of the children from Nebraska to Utah was not in their best interests.

Because these assignments of error are related, we will address them together. We begin our analysis by setting forth the general propositions of law that apply to modifications of child custody and requests for removal, followed by the specific propositions that apply in cases where the parent seeking removal is not the sole custodial parent but instead shares joint legal and physical custody with the other parent.

[3,4] Ordinarily, custody of a minor child will not be modified unless there has been a material change of circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000). The party seeking modification of child custody bears the burden of showing such a change of circumstances. See *id*.

[5] In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014). After clearing that threshold, the custodial parent must also demonstrate that it is in the child's best interests to continue living with him or her in the new location. *Id*.

[6,7] The application of these standards is slightly different in cases where, as here, the parent seeking removal does not have sole custody. When a parent sharing joint legal and physical custody seeks to modify custody and relocate, that parent must first prove a material change in circumstances affecting the best interests of a child by evidence of a legitimate reason to leave the state, together with an expressed intention to do so. See *Brown v. Brown, supra*. Proving such an intent does not necessitate that physical custody be modified, but the intent to move illustrates the likelihood that there is a need for considering some sort of modification that would reflect the new circumstances. *Id*.

[8] Once the party seeking modification has met this threshold burden, the separate analyses of whether custody should be modified and whether removal should be permitted necessarily become intertwined. *Id*. The question becomes whether the best interests of the child are furthered by the relocating parent's obtaining sole physical custody and moving the child

out of state. See *id*. As a practical matter, the existence of a joint physical custody relationship is likely to make it more difficult for the relocating parent to meet the burden associated with relocation. *Id*.

### (a) Legitimate Reason
### to Leave State

The district court found that Brekk had a legitimate reason for leaving the state. On appeal, neither party assigns error with respect to this determination.

We note that in *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000), the Nebraska Supreme Court held that the threshold question of whether a party seeking removal has a legitimate reason to leave the state must be analyzed first, before considering whether removal is in the child's best interests. However, more recently, in *Steffy v. Steffy, supra*, the court declined to address whether there was a legitimate reason for relocation because its holding on best interests was dispositive.

[9] In the present case, because this issue is not assigned as error and our analysis on best interests is dispositive of our decision to affirm the denial of Brekk's request for removal, we need not address whether Brekk had a legitimate reason for leaving the state. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

### (b) Best Interests of Children

[10,11] Whether we are considering a modification of custody or a proposed removal from the state, the paramount consideration is the best interests of the children. See *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000). In determining whether removal to another jurisdiction is in the child's best interests, the trial court evaluates three considerations: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child

and the noncustodial parent. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). We will address each of these considerations in turn.

### (i) Each Parent's Motives

[12] The ultimate question in evaluating the parties' motives is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *Id*. Based on our review of the record, we find no evidence that either party has acted in bad faith.

Brekk's primary motive in seeking removal is to be near her parents and extended family in Utah. She has no family and few friends in Nebraska. Brekk agreed to move to Nebraska only temporarily while Troy attended law school, and she never agreed or intended to reside in Nebraska permanently. We find that her desire to return to Utah is reasonable and genuine, and is not based on a desire to interfere with Troy's custody rights or any other ulterior motive.

Troy's desire to remain in Nebraska is based on the fact that he has invested time and resources in developing professional contacts in Nebraska and has opened his own law practice, which he believes will become more profitable in the near future. In order to practice law in Utah, Troy would have to prepare for and pass the Utah bar examination and essentially start over with his legal career in Utah. He has a close relationship with his children, which would be significantly impacted if the children were removed from Nebraska. Thus, Troy's motives for resisting removal do not appear to be spiteful or vindictive, but based on his desire to have a continuing relationship with his children.

We find that both parents have valid reasons for their respective positions on the removal of the children from Nebraska to Utah. As such, their motives do not weigh in favor of or against removal.

### (ii) Quality of Life

[13] In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the children and the parent seeking removal, a court should

consider the following factors: (1) the emotional, physical, and developmental needs of the children; (2) the children's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the children and each parent; (7) the strength of the children's ties to the present community and extended family there; and (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties. *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000). This list should not be misconstrued as setting out a hierarchy of factors. *Id*. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id*.

We find that both Troy and Brekk are equally capable of meeting the emotional, physical, and developmental needs of the children. Other than the potential for the children to develop relationships with their extended families in Utah, there is no evidence that their emotional, physical, or developmental needs could be better served by relocating to Utah with Brekk. In fact, the evidence shows that the children have a strong bond with both Troy and Brekk and that the children have become accustomed to spending alternating weeks with each parent. We conclude that maintaining a quality relationship with both parents will provide a greater benefit to the children than living in close proximity to extended family members in Utah with whom they may form a bond. Thus, we find the first and sixth factors of the quality-of-life consideration weigh against removal.

We are unable to determine whether Brekk's employment or income would be enhanced by relocating to St. George, because she has made no effort to secure comparable employment in Nebraska. The terms of the job offer in St. George require her to work weekdays from approximately 9 a.m. to 4 p.m. for a total of 30 to 35 hours per week. Significantly, Brekk testified that she was not willing to accept employment in Nebraska unless it allowed her to stay home with

her children every other week. In other words, even if this very same job offer and salary were available to Brekk in Nebraska, she would not accept it. We therefore conclude that Brekk's lower income and lack of employment opportunities in Nebraska are directly related to her unwillingness to accept comparable employment in Nebraska. This factor does not weigh in favor of removal.

We find that the living conditions for Brekk and the children would be improved in St. George, insofar as they would be living in a very comfortable home with a fenced backyard, rather than a small apartment. However, Brekk's father intends to sell the house that Brekk and the children would be living in, and once it is sold, they would have to move into another home that her father desires to sell. This perpetual "house sitting" arrangement would not provide a permanent home for the children. Brekk's alternative housing plan was to rent an apartment similar to her apartment in Nebraska, which would not be a significant improvement in housing. Overall, we find this factor to be neutral and give it little weight in our de novo review.

We find no evidence to suggest that relocating to St. George would offer educational advantages to the children. Brekk testified extensively regarding the educational opportunities at the charter school to which Cohen had been accepted in St. George. However, there was no evidence presented to show that the schools in Nebraska were inferior to that school in any way. This factor does not weigh in favor of removal.

There is no indication that allowing or denying the move would antagonize hostilities between the two parties. Troy testified that allowing the move would not make a significant difference in hostilities between them. Brekk agreed that she and Troy would be able to work together regardless of whether she relocated to Utah or stayed in Nebraska. This factor appears to be neutral, and it does not merit much weight in our de novo review.

Upon considering all of the relevant factors, we agree with the district court's conclusion that there is little evidence to suggest that the children's quality of life would be significantly improved in Utah. Any potential advantages associated

with relocating to Utah are clearly outweighed by the harm of separating the children from Troy. Thus, we find that the overall quality-of-life consideration weighs against removal.

### (iii) Impact on Noncustodial
### Parent's Visitation

[14,15] The final consideration in the best interests analysis is the impact such a move will have on contact between the children and the noncustodial parent. This effect must be viewed in light of the court's ability to devise reasonable visitation arrangements. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Of course, the frequency and the total number of days of visitation and the distance traveled and expense incurred go into the calculus of determining reasonableness. *Id.* The determination of reasonableness is to be made on a case-by-case basis. *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014).

Although Brekk appears to be in favor of Troy's having extensive visitation with the children during school holidays and summers, there is little doubt that allowing removal would have a significant adverse impact on the children's relationship with Troy. Brekk's proposed visitation arrangement, based on Cohen's school schedule, would allow the children to spend approximately 45 days with Troy during the 9-month school year, plus 12 weeks during the summer. We find it highly unlikely that Troy would be able to spend all of those days with his children each year due to the necessary travel time and the likelihood of some scheduling conflicts with Troy's practice. Furthermore, it does not appear that either party currently has the ability to pay the travel expenses necessary to accommodate all of these visits.

Even absent any issues with scheduling or travel expenses, this arrangement would drastically reduce the amount of time that Troy currently spends with his children. The children are accustomed to spending every other week with Troy and

have developed a close bond with him. Given the distance between Nebraska and Utah and the fact that the children will be attending school, we do not believe a reasonable visitation arrangement could be devised that would provide a satisfactory basis for preserving and fostering the children's relationship with Troy. Therefore, this consideration weighs against removal.

### (iv) Conclusion on
### Best Interests

We agree with the district court's conclusion that the shared custody arrangement set forth in the parenting plan continues to be in the best interests of the children. Troy and Brekk have been alternating physical custody of the children every other week for at least a year, and there is no evidence that this arrangement was not working. Because Brekk was the one seeking a modification of custody and permission to remove the children from Nebraska, it was her burden to establish that doing so would be in the children's best interests, which she has failed to do. Therefore, we conclude that the trial court did not err in denying Brekk's request for modification of custody and permission to remove the children to Utah. Brekk's first through fifth assignments of error are without merit.

### 2. Choice of School

For her final assignment of error, Brekk asserts that the district court erred in granting Troy the authority to determine the school of the minor children. We agree with the district court's conclusion that it was in Cohen's best interests to attend school in Lincoln, rather than Gretna.

The evidence at trial established that Cohen was scheduled to begin kindergarten the following month, but the parties were unable to agree on where he would attend school. Troy testified that it would be in Cohen's best interests to attend a public school in Lincoln, but Brekk desired for Cohen to attend a charter school in St. George. The charter school in Utah is no longer a viable option, in light of our decision that removing the children to Utah would not be in their best interests. With respect to where Cohen should attend school in Nebraska,

Brekk presented no opinion on the matter at trial. She testified generally that she had looked into an elementary school in Gretna, but she never indicated that she wanted Cohen to attend school there.

The evidence shows that the parties agreed to move to Lincoln and resided there together until they separated, at which point Brekk moved to Gretna. Troy has a developing law practice in Lincoln, while Brekk has no employment tying her to Gretna. In fact, Brekk acknowledged that there was no reason she could not relocate to Lincoln. Given these facts, we find that there is a greater potential for permanency in Lincoln, as opposed to Gretna.

Because the parties could not agree on where Cohen would attend school, the court made the decision that it was in Cohen's best interests to attend school in Lincoln, and the court allowed Troy to determine which specific school Cohen would attend. We find no abuse of discretion in this decision.

## VI. CONCLUSION

The district court did not err in determining that removal of the children from Nebraska to Utah would not be in the children's best interests and that it would be in Cohen's best interests to attend school in Lincoln. We affirm the district court's judgment in all respects.

AFFIRMED.

─────────────

IN RE INTEREST OF SETH K. AND DINAH K.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
DEBORAH P., APPELLANT.
___ N.W.2d ___

Filed September 2, 2014.    No. A-14-002.

1. **Juvenile Courts: Evidence: Appeal and Error.** Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.