conviction for use of a weapon to commit a felony. We therefore reverse the conviction and, for reasons based on Double Jeopardy explained above, remand the cause with directions to vacate the conviction and dismiss the charge of use of a weapon to commit a felony. We further conclude that there was sufficient evidence to support the $7,500 amount of restitution ordered with respect to the felony criminal mischief conviction. We therefore affirm the $7,500 amount of restitution in the sentence for felony criminal mischief but we remand the cause for resentencing with respect to the manner of payment of restitution.

Affirmed in part, and in part reversed
and remanded with directions.

---

Ember M. Schrag, appellant, v.
Andrew S. Spear, appellee.
___ N.W.2d ___

Filed February 13, 2015.    No. S-13-258.

1. **Child Custody: Appeal and Error.** Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

3. ____: ____. A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result.

4. **Child Custody: Appeal and Error.** In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

5. **Child Custody.** Before a custodial parent can remove a child from the state, permission of the court is required, whether or not there is a travel restriction placed on the custodial parent.

6. ____. In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent

must also demonstrate that it is in the child's best interests to continue living with him or her in the new location. The paramount consideration is whether the proposed move is in the best interests of the child.

7. ____. Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action.

8. **Modification of Decree: Words and Phrases.** A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.

9. **Modification of Decree: Child Custody: Proof.** The party seeking modification of child custody bears the burden of showing a change in circumstances.

10. **Modification of Decree: Child Custody: Evidence: Time.** In determining whether the custody of a minor child should be changed, the evidence of the custodial parent's behavior during the year or so before the hearing on the motion to modify is of more significance than the behavior prior to that time.

11. **Modification of Decree: Child Custody.** Removal of a child from the state, without more, does not amount to a change of circumstances warranting a change of custody. Nevertheless, when considered in conjunction with other evidence, such a move may well be a change of circumstances that would warrant a modification of the decree.

12. **Modification of Decree: Child Custody: Proof.** Before custody may be modified based upon a material change in circumstances, it must be shown that the modification is in the best interests of the child.

13. **Child Custody.** In addition to the "best interests" factors listed in Neb. Rev. Stat. § 43-2923 (Cum. Supp. 2014), a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child.

14. **Child Custody: Appeal and Error.** In contested custody cases, where material issues of fact are in great dispute, the standard of review and the amount of deference granted to the trial judge, who heard and observed the witnesses testify, are often dispositive of whether the trial court's determination is affirmed or reversed on appeal.

Petition for further review from the Court of Appeals, Irwin, Moore, and Bishop, Judges, on appeal thereto from the District Court for Lancaster County, Steven D. Burns, Judge. Judgment of Court of Appeals reversed, and cause remanded with directions.

Stephanie R. Hupp and Zachary L. Blackman, of McHenry, Haszard, Roth, Hupp, Burkholder & Blomenberg, P.C., L.L.O., for appellant.

Amie C. Martinez, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellee.

WRIGHT, CONNOLLY, STEPHAN, MCCORMACK, MILLER-LERMAN, and CASSEL, JJ.

STEPHAN, J.

The Nebraska Court of Appeals reversed an order of the district court for Lancaster County which denied Ember M. Schrag's application to move her minor daughter to New York and modified a prior custody determination by awarding custody of the child to her father, Andrew S. Spear.[1] On further review, we conclude the district court did not abuse its discretion and therefore reverse the judgment of the Court of Appeals.

## I. BACKGROUND

### 1. FACTS

The underlying facts are set forth in greater detail in the published opinion of the Court of Appeals. We summarize them here.

Lillian Schrag was born in November 2007 and resided with Ember in Lincoln, Nebraska. Ember initiated a paternity action in the district court for Lancaster County in which she alleged that Andrew was Lillian's biological father. Ember and Andrew were never married and never lived together after Lillian's birth. In a decree entered January 21, 2009, the court determined Andrew was Lillian's father. The court awarded custody of Lillian to Ember, subject to Andrew's rights of visitation as set forth in a parenting plan. Andrew was ordered to pay child support for Lillian and one-half of the childcare expenses incurred by Ember. At the time of the decree and at all subsequent times, Andrew has resided near Kansas City, Missouri.

---

[1] See *Schrag v. Spear*, 22 Neb. App. 139, 849 N.W.2d 551 (2014).

Cindy Chesley is Ember's mother and Lillian's grand-mother. She and her husband reside in North Platte, Nebraska. From late 2008 through 2010, Chesley and her husband cared for Lillian for extended periods of time while Ember worked as a touring folk singer. Chesley and Ember had a falling out in early 2011 when Chesley told Ember she would be unable to care for Lillian for another extended period due to other family obligations. Ember testified she had no ongoing relationship with Chesley and that they had been "estranged for two years."

In early 2011, Ember moved with Lillian to Decorah, Iowa, where they resided with Ember's boyfriend and his parents. Ember married this man in April 2011. She did not obtain approval of the court before relocating Lillian from Nebraska to Iowa. Andrew, believing the move was temporary, did not oppose it until Ember presented him with documents indicating the move was permanent. Andrew obtained emergency custody of Lillian for a brief time before she was returned to Ember's custody. Andrew thereafter sought modification of custody, and Ember sought court approval to move Lillian to Iowa, which had already occurred. The parties eventually resolved this dispute by entering into a stipulation and parenting plan which were approved by the court in an order entered on February 22, 2012. This order left Lillian in Ember's physical custody and granted Ember permission to move to Iowa with the child.

The parenting plan provided that the parties would have joint legal custody of Lillian and specified Andrew's rights of visitation. The plan also provided that the parties would "reside in the states of Nebraska, Missouri (including the Kansas City metro), and Iowa unless otherwise agreed to by the parties." Further, the parenting plan provided that Lillian was to have no unsupervised contact with Chesley. The final paragraph of the parenting plan provides: "The parties intend for Nebraska to maintain jurisdiction of this matter as the home state for the child."

While Ember and Lillian resided in Iowa, Ember worked two part-time jobs, which she did not consider to be related to her music career. In June 2012, while Lillian was with Andrew

for her summer visitation, Ember separated from her husband. A September 6 decree dissolving the marriage was entered by an Iowa court.

On the same day that she separated from her husband, Ember traveled to the home of Robert Bannister in Brooklyn, New York. She had met Bannister in March 2011, and became romantically involved with him when she arrived at his home in June 2012. Bannister, who is approximately 24 years older than Ember, is employed in the software industry. He is separated but not divorced from his second wife.

Ember spent most of the summer of 2012 on the East Coast, primarily in New York and Philadelphia, Pennsylvania, where she had a housesitting job. She testified that while there, she was "looking for a living arrangement that would be in the best interest" and eventually decided to move to New York.

On approximately August 27, 2012, Andrew returned Lillian to Ember at their agreed-upon meeting place in Des Moines, Iowa. They exchanged pleasantries, but Ember made no mention of any change in her living arrangements. Ember then almost immediately took Lillian to New York and moved into Bannister's apartment, where they have subsequently resided.

On August 30, 2012, after she had relocated to New York, Ember sent an e-mail message to Andrew informing him that she had separated from her husband and had spent the summer "working on the east coast and developing a new support system in Philadelphia and New York City." She informed him for the first time of Lillian's relocation, stating: "Although this is the first you're hearing of it, this is not sudden, and it will be the best for Lillian." Andrew responded, "I do not agree moving Lillian to New York is what's best for her." Ember did not seek or obtain approval of the district court prior to relocating Lillian to New York.

Ember and Lillian have continued to reside with Bannister in his two-bedroom apartment in Brooklyn. Other than occasional musical performances, Ember is not employed, and she takes care of Lillian when Lillian is not in school. When Ember is performing outside New York, Bannister cares for Lillian. Ember and Lillian are entirely dependent on Bannister for housing. Ember's income was approximately $8,000 in 2012,

and her only regular income during 2013 was from Andrew's monthly child support payments.

Andrew was married in 2010 and resides with his wife and children in Liberty, Missouri, near Kansas City. He is employed as a restaurant manager, and his wife is also employed outside the home. They have a good relationship with Lillian and believe she is comfortable in their home. Andrew has extended family in the Kansas City area and enjoys a good relationship with Chesley, whom he invites for a visit whenever Lillian is visiting his home.

## 2. Procedural Background

### (a) District Court

Upon learning that Ember had relocated with Lillian to New York, Andrew filed a complaint in the district court for Lancaster County seeking an award of legal and physical custody of Lillian. Ember filed an answer and a counterclaim in which she sought permission of the court to move Lillian from Iowa to New York.

After a trial at which Ember, Andrew, Chesley, Bannister, and other witnesses testified, the district court entered an order denying Ember's request to move Lillian to New York. The court examined Ember's motives for the relocation, its potential for enhancement of Lillian's quality of life, and its impact on Andrew's parenting time.[2] Based on this analysis, it concluded Ember had not carried her burden of establishing that the move to New York was in Lillian's best interests. And it made a further finding that under the circumstances of the case, the move was not in Lillian's best interests.

The court concluded Andrew had met his burden of proving a material change in circumstances which warranted modification of custody. The court awarded primary physical custody of Lillian to Andrew, subject to Ember's reasonable rights of visitation. The court also calculated Ember's child support obligation and vacated that portion of its prior order which placed restrictions on Chesley's contact with Lillian.

─────────

[2] See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

### (b) Court of Appeals

Ember perfected a timely appeal, asserting that the district court erred in modifying custody, denying her application to remove Lillian to New York, removing the restrictions on Chesley's visitation with Lillian, and calculating her support obligation. A divided panel of the Court of Appeals affirmed in part, and in part reversed, and remanded with directions.[3] The majority concluded that the district court abused its discretion when it denied Ember permission to move Lillian to New York and when it awarded physical custody of Lillian to Andrew. But the majority concluded that the district court did not err when it removed the restrictions on Chesley's visitation with Lillian and calculated Ember's child support obligation. The dissent concluded that the district court had not abused its discretion with respect to any of its rulings.

We granted Andrew's petition for further review.

## II. ASSIGNMENTS OF ERROR

Andrew assigns, restated, that the Court of Appeals erred in concluding that the district court abused its discretion in (1) denying Ember permission to relocate Lillian to New York and (2) modifying its orders to award physical custody of Lillian to Andrew. Neither party sought further review of the Court of Appeals' decision with respect to visitation by Chesley or the calculation of Ember's child support obligation.

## III. STANDARD OF REVIEW

[1] Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.[4]

[2,3] An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason,

---

[3] *Schrag, supra* note 1.

[4] *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013); *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007).

and evidence.[5] A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result.[6]

[4] In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[7]

## IV. ANALYSIS

### 1. RELOCATION

We have previously observed that parental relocation cases are "among the most complicated and troubling" cases that courts must resolve.[8] This is so because of the competing and often legitimate interests of the parents in proposing or resisting the move, and because courts ultimately have the difficult task of weighing the bests interests of the child at issue "which may or may not be consistent with the personal interests of either or both parents."[9] In these cases, courts are required to balance the noncustodial parent's desire to maintain their current involvement in the child's life with the custodial parent's chance to embark on a new or better life.[10] It is for this reason that such determinations are matters initially entrusted to the discretion of the trial judge, and the trial judge's determination is to be given deference.[11]

This case also has two other areas of potential complexity. First, the record shows that neither parent nor the child resided in Nebraska at the time the district court was asked to approve the relocation to New York. The parenting plan

---

[5] *Watkins, supra* note 4.

[6] *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002).

[7] *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

[8] *Farnsworth, supra* note 2, 257 Neb. at 248, 597 N.W.2d at 597.

[9] *Id.* at 249, 597 N.W.2d at 597.

[10] *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014).

[11] *Id.*

approved in the 2012 order specifically provided that "[t]he parties intend for Nebraska to maintain jurisdiction of this matter as the home state for the child." We note there has been no determination by a court of this state or any other state that we lack jurisdiction.[12] Second, the record shows that the child in question was born out of wedlock. In *Coleman v. Kahler*,[13] the Court of Appeals held that Nebraska's removal jurisprudence does not apply to a child born out of wedlock where there has been no prior adjudication addressing child custody or parenting time. But in this case, there were two prior custody determinations—the initial paternity decree in 2009 and the 2012 order which permitted Ember to relocate with Lillian to Iowa. Accordingly, we conclude that the district court had jurisdiction to decide Ember's request to relocate Lillian from Iowa to New York. We conclude that legal principles governing requests by custodial parents to relocate children from Nebraska to another state are applicable in this action.

[5,6] Before a custodial parent can remove a child from the state, permission of the court is required, whether or not there is a travel restriction placed on the custodial parent.[14] In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state.[15] After clearing that threshold, the custodial parent must also demonstrate that it is in the child's best interests to continue living with him or her in the new location.[16] The paramount consideration is whether the proposed move is in the best interests of the child.[17] We have discouraged trial courts from

---

[12] See Neb. Rev. Stat. § 43-1239 (Reissue 2008).

[13] *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009).

[14] *State ex rel. Reitz v. Ringer*, 244 Neb. 976, 510 N.W.2d 294 (1994), *overruled on other grounds, Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999); *Coleman, supra* note 13.

[15] See, *Daniels v. Maldonado-Morin*, 288 Neb. 240, 847 N.W.2d 79 (2014); *Steffy, supra* note 10.

[16] See *id*.

[17] *Id*.

granting temporary permission to remove children to another jurisdiction prior to a ruling on permanent removal, because such temporary permission "complicates matters and makes more problematic the subsequent ruling on permanent removal and encumbers appellate evaluation of the ultimate decision on permanent removal."[18] In this case, Ember's removal of Lillian from Iowa to New York without seeking *any* prior approval of the district court has created a similar problematic scenario.

As noted, the threshold issue with respect to removal is whether the custodial parent had a legitimate reason for the proposed relocation.[19] Although the district court did not make a specific finding as to whether Ember had a legitimate "reason" to move to New York, it examined the legitimacy of her motives for relocating. As we noted in *Farnsworth v. Farnsworth*,[20] the legitimacy of the custodial parent's motive for a proposed relocation is part of the "threshold question" of whether the parent has a legitimate reason for moving, and also plays a "further role in ascertaining a child's best interests" if the threshold showing is made. Thus, we consider the district court's findings with respect to the legitimacy of Ember's motives as pertinent to whether she established a legitimate reason for the move.

The district court found no merit to Ember's contention that the relocation was necessary in order to establish a new living arrangement and support system, because both of those factors were entirely dependent upon the continuation of her relationship with Bannister, a married man whom she had known for approximately 1 year and whom Lillian had never met prior to the relocation. The district court also made a specific finding that Ember "has not carried the burden of establishing that career enrichment was a legitimate motive for the move," noting that there was "no evidence to support that moving to New York would or has advanced [her] music career or the income associated with her music career."

---

[18] *Jack v. Clinton*, 259 Neb. 198, 210, 609 N.W.2d 328, 337 (2000).

[19] *Daniels, supra* note 15; *Steffy, supra* note 10.

[20] *Farnsworth, supra* note 2, 257 Neb. at 250, 597 N.W.2d at 598.

These findings are fully supported by the record. We cannot agree with the Court of Appeals' conclusion that "Ember's reasonable expectation of improvement in her music career" in New York was a legitimate reason for the move.[21] It is true that absent some aggravating circumstance, such as an ulterior motive to frustrate the noncustodial parent's visitation rights, significant career enrichment is a legitimate reason for relocation.[22] For example, job-related changes are legitimate reasons for moving where there is a reasonable expectation of improvement in the career or occupation of the custodial parent and the custodial parent's new job included increased potential for salary advancement.[23] We have held that a firm offer of employment in another state with a flexible schedule in close proximity to the custodial parent's extended family constitutes a legitimate reason for relocation.[24] Likewise, we have held that a career enhancement for a custodial parent's spouse is a legitimate reason for removal when the career change occurred after a marriage.[25]

But unlike the other cases in which we have applied these principles, Ember did not relocate in order to accept a firm offer of employment or any other definite income-generating activity, in the music industry or otherwise. She had only a vague notion that her music career would somehow be enhanced by living in New York. But she has been unemployed since the relocation, and her musical performances have not generated any appreciable income or demonstrable career enhancement. At the time of the relocation and since, she and Lillian have been almost entirely dependent for their housing upon Bannister, who has no legal obligation to shelter or otherwise support either of them.

---

[21] *Schrag*, *supra* note 1, 22 Neb. App. at 163, 849 N.W.2d at 570.

[22] *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000); *Farnsworth*, *supra* note 2.

[23] *Jack*, *supra* note 18; *Farnsworth*, *supra* note 2.

[24] See, *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000); *Jack*, *supra* note 18.

[25] See *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002).

And we agree with the conclusion of the district court that Ember had an ulterior motive for the relocation. The record fully supports the district court's determination that

one of Ember's unstated motives was to avoid Andrew's and this Court's involvement in the decision to move . . . . This is not the first time Ember has moved Lillian from one state to another without seeking Lillian's father's input on the decision. It is not the first time Ember has moved without seeking court permission. It is not the first time she has move[d] surreptitiously. Ember cannot claim ignorance of the requirement of court approval. Nor can she claim ignorance of the importance of involving Andrew in such decisions.

The record reflects quite clearly that Ember moved to New York with no firm or even likely prospects for employment or career enhancement, that she did so with the intent of entering into a living arrangement which offered no assurance of stability or permanency for herself or her child, and that she orchestrated the move in a manner designed to impair Andrew's parental rights and evade the jurisdiction of the district court. Based upon our de novo review, and the deference which we give to the factual determinations of the district court, we conclude that Ember did not have a legitimate reason for the relocation. Because she did not meet this threshold burden, we need not engage in a best interests analysis on this issue.

## 2. Modification of Custody

[7,8] The legal principles governing modification of child custody are well settled. Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action.[26] A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at

---

[26] *Watkins, supra* note 4; *Heistand v. Heistand*, 267 Neb. 300, 673 N.W.2d 541 (2004); *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002).

the time of the initial decree, would have persuaded the court to decree differently.[27]

### (a) Material Change in Circumstances

Here, the district court found that Andrew had met his burden of establishing a material change in circumstances. The Court of Appeals acknowledged that "Ember's decision to move to New York to live with Bannister after her divorce . . . might constitute a change in circumstances," but it concluded that there was no evidence that the move had any adverse effect on Lillian.[28]

[9,10] The party seeking modification of child custody bears the burden of showing a change in circumstances.[29] In determining whether the custody of a minor child should be changed, the evidence of the custodial parent's behavior during the year or so before the hearing on the motion to modify is of more significance than the behavior prior to that time.[30]

[11] Removal of a child from the state, without more, does not amount to a change of circumstances warranting a change of custody.[31] Nevertheless, when considered in conjunction with other evidence, such a move may well be a change of circumstances that would warrant a modification of the decree.[32] Here, Ember moved Lillian from Iowa to New York without Andrew's knowledge just months after she signed and asked a court to approve a parenting plan in which she agreed to notify Andrew of any plan to change her residence, and further agreed to reside in Nebraska, Iowa, or Missouri unless otherwise agreed to by Andrew. Further, Ember conducted the move without prior approval of the court just months after resolving a dispute involving her move from Nebraska to Iowa without court approval.

---

[27] *Tremain, supra* note 26.

[28] *Schrag, supra* note 1, 22 Neb. App. at 156, 849 N.W.2d at 566.

[29] *Tremain, supra* note 26.

[30] *Heistand, supra* note 26.

[31] *Brown, supra* note 24.

[32] *Id.*

In *State ex rel. Reitz v. Ringer*,[33] we held that a trial court did not err in finding a material change in circumstances warranting modification of custody where a custodial parent removed a child from Nebraska without obtaining permission of the court which had adjudicated paternity and granted custody and visitation rights. We reasoned that such action denied the noncustodial parent his court-ordered visitation rights. Here, Ember's intentional and unilateral conduct had the effect of negating provisions of the existing parenting plan regarding the parties' place of residence, and thus affected the manner in which Andrew was able to exercise his visitation rights. As the district court correctly determined, the relocation to New York "has a substantial adverse impact on the relationship between Lillian and Andrew."

We agree with the dissenting member of the Court of Appeals that such conduct on Ember's part "clearly constitutes a material change in circumstances."[34] And we therefore conclude that the district court did not abuse its discretion in reaching the same conclusion.

### (b) Best Interests

[12] Before custody may be modified based upon a material change in circumstances, it must be shown that the modification is in the best interests of the child.[35] Neb. Rev. Stat. § 43-2923 (Cum. Supp. 2014), requires a court, in determining custody and parenting arrangements, to consider certain factors relevant to the best interests of the minor child, including:

> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological

[33] *State ex rel. Reitz, supra* note 14.

[34] *Schrag, supra* note 1, 22 Neb. App. at 177, 849 N.W.2d at 578 (Moore, Judge, concurring in part, and in part dissenting).

[35] See, *Brown, supra* note 24; *Parker v. Parker*, 234 Neb. 167, 449 N.W.2d 553 (1989).

age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

[13] In addition to these statutory "best interests" factors, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child.[36]

In concluding that the change of custody was in Lillian's best interests, the district court reasoned that Ember's conduct had brought about abrupt endings of very important relationships for Lillian and that such conduct "has made it abundantly clear that she does not care what Andrew thinks about raising Lillian." The court determined that Ember's abrupt and unilateral decision to move to New York with Lillian "demonstrates an inability to abide [by] agreements she makes with Andrew and does not bode well for any expectation by Andrew or this Court that continuing custody with Ember would have any likelihood of her involving Andrew in Lillian's life in any meaningful way." The court further found that "Andrew has impressed the Court with his willingness to involve Ember." It found that the parenting plan submitted by Andrew was reasonable and in Lillian's best interests.

---

[36] See *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996).

The Court of Appeals reasoned modification of custody was not shown to be in Lillian's best interests, because the evidence showed that she was "'calm and secure and happy'" in her new surroundings and Andrew had not presented "any specific evidence that the changes in Ember's life have had a negative impact on Lillian."[37] It further reasoned that stability "should not be based solely upon a parent's relocation" and that it would be "particularly unfair in this case to remove Lillian from Ember's primary care when Ember has now found a way to be at home with Lillian more while still having opportunities to advance her music career."[38]

We agree with the dissent that Ember's evidence that Lillian is "'flourishing'" in New York should be discounted, because such evidence was "only developed as a result of Ember's unilateral decision to move Lillian there before obtaining either Andrew's consent or prior court approval."[39] The dissent further reasoned that a showing of actual harm to a child as a result of a material change in circumstances is not required and that "by evaluating the relevant best interests factors and choosing to modify custody, a trial court can essentially find by implication that the change in circumstances has an adverse impact upon the child."[40] The dissent reasoned that Ember's conduct with respect to her relocation to New York "speaks to [her] judgment, which, albeit indirectly, speaks to her suitability as a custodial parent."[41] As examples of Ember's judgmental deficiencies detrimental to Lillian's best interests, the dissent noted that she moved into Bannister's home with Lillian only within 2 or 3 months after beginning a romantic relationship with him and without Lillian's previously having met him. The dissent further noted that Ember is entirely

---

[37] *Schrag, supra* note 1, 22 Neb. App. at 158, 849 N.W.2d at 567.

[38] *Id.* at 159, 849 N.W.2d at 567.

[39] *Id.* at 178, 849 N.W.2d at 578-79 (Moore, Judge, concurring in part, and in part dissenting).

[40] *Id.* at 179-80, 849 N.W.2d at 579.

[41] *Id.* at 182, 849 N.W.2d at 581.

dependent upon Bannister for housing and support and that she and Lillian would have no place to go if that relationship ended. The dissent viewed the evidence as tending to show that "Ember is making decisions, changes in relationships, and far-reaching moves that serve *her* desires and musical interests rather than a consideration of how these changes affect Lillian."[42]

We agree with the dissent that a noncustodial parent need not show that actual harm has befallen a child in order to establish that a modification of custody due to a material change in circumstances would be in the child's best interests. And we also agree that the record reflects significant flaws in Ember's judgment which could adversely impact Lillian's life and well-being. Ember precipitously decided to move Lillian to a city where Ember has no job or other apparent means of support and into the home of a man with whom she had only recently begun a romantic relationship and whom Lillian had not previously met. Ember admitted that she has no family in New York, and as noted by the dissent, she readily acknowledged that she would have "nowhere to live" if the relationship with Bannister ended.[43] In contrast, the evidence reflects that Andrew can provide Lillian with a stable home and financial security with a nearby network of extended family. The district court rejected Ember's criticism of Andrew's parenting skills, finding such criticism to be "disingenuous" and without significance.

This case differs from *Tremain v. Tremain*,[44] in which we affirmed a trial court's determination that a custodial father had not established grounds to remove his children to another state, but reversed the trial court's modification of the decree to award permanent custody to the mother. The father had removed the children from Nebraska to Oregon, where he had obtained new employment, without first obtaining approval of the court. In response to a contempt order, the children

---

[42] *Id.* at 183, 849 N.W.2d at 582.

[43] *Id.* at 183, 849 N.W.2d at 581.

[44] *Tremain,* supra note 26.

were returned to the temporary custody of their mother in Nebraska pending resolution of the removal issue, while the father remained in Oregon. There was no evidence beyond the move to Oregon to support a finding of a material change in circumstances. In reversing the modification order, we determined that because both parents were fit to have custody, the trial court should have ascertained whether the father would relocate back to Nebraska in order to retain custody of the children.

In this case, as in *Tremain*, both parents are fit to have custody. But when Ember was asked where she would live if the court granted custody of Lillian to Andrew, she replied: "Well, New York City is the place that I currently have a workable solution." Although given an opportunity to do so, she gave no indication that she would relocate in order to retain custody. Further, this is not the first time Ember has uprooted Lillian without permission. Here, the relocation is not the only evidence that supports a finding of a material change in circumstances.

We conclude that the district court did not err in determining that there had been a material change in circumstances which warranted a modification of custody.

## V. CONCLUSION

[14] In contested custody cases, where material issues of fact are in great dispute, the standard of review and the amount of deference granted to the trial judge, who heard and observed the witnesses testify, are often dispositive of whether the trial court's determination is affirmed or reversed on appeal.[45] The resolution of key issues in this case were dependent on the trial judge's assessment of Ember's credibility and her motives in moving Lillian to New York without prior approval of the court, and of Andrew's motives and credibility in resisting the move and seeking modification of custody.

Based on our de novo review of the record, we agree with the dissenting member of the Court of Appeals that the trial

---

[45] *Marcovitz v. Rogers*, 267 Neb. 456, 675 N.W.2d 132 (2004).

court did not abuse its discretion in its resolution of these issues in favor of Andrew. We reverse the judgment of the Court of Appeals with respect to the issues of removal and modification of custody. Because further review was not requested, we do not disturb that portion of the Court of Appeals' judgment pertaining to visitation by Chesley and Ember's child support obligation. We remand the cause to the Court of Appeals with directions to affirm the judgment of the district court in all respects.

REVERSED AND REMANDED WITH DIRECTIONS.

HEAVICAN, C.J., participating on briefs.

———————————

DWIGHT E. WHITESIDES, APPELLEE, V.
LINDA M. WHITESIDES, APPELLANT.
___ N.W.2d ___

Filed February 13, 2015.    No. S-13-493.

1. **Pleadings: Judgments.** A postjudgment motion must be reviewed based on the relief sought by the motion, not based on the title of the motion.
2. **Motions to Vacate: Proof: Appeal and Error.** An appellate court will reverse a decision on a motion to vacate or modify a judgment only if the litigant shows that the district court abused its discretion.
3. **Judges: Words and Phrases.** A judicial abuse of discretion exists when reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
4. **Jurisdiction: Words and Phrases.** Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.
5. **Courts: Jurisdiction: Divorce.** Pursuant to Neb. Rev. Stat. § 42-351 (Reissue 2008), full and complete general jurisdiction over the entire marital relationship and all related matters is vested in the district court in which a petition for dissolution of marriage is properly filed.
6. **Courts: Jurisdiction: Divorce: Property Settlement Agreements.** A district court, in the exercise of its broad jurisdiction over marriage dissolutions, retains jurisdiction to enforce all terms of approved property settlement agreements.
7. **Courts: Jurisdiction.** A court that has jurisdiction to make a decision also has the power to enforce it by making such orders as are necessary to carry its judgment or decree into effect.